## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **EQT PRODUCTION COMPANY**, a Pennsylvania corporation,<br><br>     **Plaintiff,**<br><br>**vs.**<br><br>**MORGAN TOWNSHIP**, a municipality of Greene County, Pennsylvania, **SHIRL BARNHART**, in his official capacity as Supervisor of Morgan Township, **ERIK MULLEN**, in his official capacity as Supervisor of Morgan Township, and **JEFF SHOLTIS**, in his official capacity as Supervisor of Morgan Township,<br><br>     **Defendants.** | **No. _____**<br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT

COMES NOW Plaintiff EQT Production Company ("EQT"), by and through its undersigned counsel, and states as follows for its Complaint against Defendants Morgan Township (the "Township"), Shirl Barnhart ("Barnhart"), Erik Mullin ("Mullin"), and Jeff Sholtis ("Sholtis") (collectively, the "Defendants"):

### INTRODUCTION

1.      After trying and failing to extract improper concessions from EQT by threat, the Defendants are attempting to derail EQT's oil and gas operations in the Township and beyond. The Defendants' unlawful conduct should end.

2.      EQT has long owned, operated and produced natural gas from various well sites throughout Greene County, Pennsylvania, including the Township. EQT's operations require the use of the Township's roads to haul heavy equipment and materials to and from these well sites and their associated pipeline systems. These heavy hauling activities are instrumental to EQT's

operations in and around the Township, as they allow EQT to maintain safe, legally compliant and productive well sites, operate an integrated oil and gas business in the region and pay significant royalties to local landowners.

3.    EQT has accordingly obtained permits from the Township to "heavy haul" on certain roads that the Township has deemed vulnerable to excess weight under its Motor Vehicle Weight Limitation Ordinance (the "Vehicle Ordinance").  As part of the Township's permitting process under its Vehicle Ordinance, EQT has historically entered into accompanying agreements with the Township to ensure proper maintenance and repair of the roads set forth in the Vehicle Ordinance (the "Regulated Roads") by, among other things, posting substantial bonds in the Township's favor as security for EQT's heavy hauling operations on said Roads.  EQT and the Township are presently parties to two such agreements (the "EQT Heavy Hauling Agreements"), which confirm EQT's broad "right to use" all Regulated Roads for permitted heavy hauling purposes as long as EQT complies with the maintenance and repair requirements of the Agreements.  EQT has complied with those requirements for years, even improving the condition of multiple Regulated Roads in the process.

4.    Despite this, the Defendants suddenly (and incorrectly) began asserting in recent months that EQT's operations had caused a "slip" on a specific stretch of Prison Road, one of the Township's 25+ Regulated Roads.  Notwithstanding the fact that EQT had not conducted any activity (heavy hauling or otherwise) on the portion of Prison Road where the slip is located *in over two decades*, EQT investigated the Defendants' claim and denied responsibility for the slip on Prison Road—which road, upon information and belief, has experienced various structural problems for years, including the slip itself.

5.     Yet the Defendants sought to take advantage of the situation, threatening EQT that if it did not repair the Prison Road slip at its sole cost and expense, the Township would "suspend" *all* present and future road permitting arrangements with EQT, heavy hauling included.  When EQT rejected this groundless and improper demand, the Defendants were quick to retaliate.

6.     Last Wednesday, June 11, the Township sent personnel, including Defendant Sholtis, to shut down all EQT heavy hauling activity throughout the Township, on the basis that the Township was "revoking" EQT's heavy hauling permits and prohibiting any and all EQT heavy hauling activity going forward unless and until EQT agreed to assume complete liability for repairing the Prison Road slip.  Two days later, Defendant Mullen threatened EQT that if it did not "quit running the roads," the Township would call in the "state troopers."  Despite EQT's efforts to resolve the Defendants' manufactured dispute, the Township has doubled down on its blanket prohibition on EQT heavy hauling activity, causing significant operational delays at multiple EQT well sites both in and outside of the Township.

7.     The Defendants' improper mass revocation of EQT's heavy hauling permits— without a hearing and on a pretext that is unrelated to any EQT heavy hauling activity in the Township—is contrary to the Commonwealth's Vehicles Code, offends due process and breaches the EQT Heavy Hauling Agreements.  But the Defendants' misconduct is also threatening EQT with irreparable harm in the form of widespread business disruption across Greene County, as EQT's inability to heavy haul on Township roads will force EQT to *shut down* various well sites and suspend ongoing projects that the Pennsylvania Department of Environmental Protection (the "PADEP") *requires* EQT to perform.  The Defendants' actions are also harming the Township's own residents.  The Defendants' interference with EQT's well sites across Greene County, for example, is compromising EQT's royalty payments to Township landowners who rely on such

payments.  This Court has the equitable authority to restrain the Defendants' unjustified conduct and abate these various harms.

8.      EQT accordingly brings this action under 42 U.S.C. § 1983 and applicable Pennsylvania law to immediately enjoin the Defendants' attempted revocation of EQT's authorization to use the Regulated Roads (or any road) in the Township for heavy hauling purposes, thereby preserving the status quo between EQT and the Township and preventing further harm to EQT (and the Township's own public) until the merits of this dispute can be decided.

## THE PARTIES

9.      Plaintiff EQT is a Pennsylvania corporation that owns and operates oil and gas wells and associated production infrastructure in southwestern Pennsylvania, including in Greene County generally and the Township specifically.  Its principal place of business is located at 625 Liberty Avenue, Suite 170, Pittsburgh, Pennsylvania 15222.  EQT is a citizen of the United States for purposes of 42 U.S.C. § 1983.

10.     Defendant Township is a Second Class Township and political subdivision of the Commonwealth of Pennsylvania, situated in Greene County, with its municipal office located at 1019 Third Street Extension, Mather, Pennsylvania 15346.  The Township is governed by a three-member Board of Supervisors  (the "Board").  The Township is a person for purposes of 42 U.S.C. § 1983.

11.     Defendant Barnhart is a Supervisor of the Township with an address for service of process at 219 Chartiers Road, Jefferson, PA 15344. He is sued here in his official capacity.

12.     Defendant Mullen is a Supervisor of the Township with an address for service of process at 225 2nd Street, Mather, PA 15346. He is sued here in his official capacity.

13.    Defendant Sholtis is a Supervisor of the Township with an address for service of process at 112 Homeville Road, Waynesburg, PA 15370. He is sued here in his official capacity.

## JURISDICTION & VENUE

14.    Subject matter jurisdiction exists under 28 U.S.C. §§ 1331, 1343, and 1367.

15.    Personal jurisdiction exists over the Township because the Township is a Second Class Township organized under the laws of the Commonwealth of Pennsylvania.

16.    Personal jurisdiction exists over Defendant Barnhart because he is a natural person domiciled in the Commonwealth of Pennsylvania.

17.    Personal jurisdiction exists over Defendant Mullen because he is a natural person domiciled in the Commonwealth of Pennsylvania.

18.    Personal jurisdiction exists over Defendant Sholtis because he is a natural person domiciled in the Commonwealth of Pennsylvania.

19.    Venue exists under 28 U.S.C. § 1391 because the Township is a resident of the Commonwealth of Pennsylvania or alternatively because the events or omissions giving rise to EQT's claims substantially occurred within this judicial district.

## FACTUAL ALLEGATIONS

**A.    Overview of EQT's integrated oil and gas operations in Greene County.**

20.    EQT has maintained oil and gas operations in Greene County generally—and the Township specifically—for years now.  These operations can be broken down into two interconnected phases: (1) production; and (2) midstream.

21.    On the production side, EQT either purchases or leases land in Greene County from local landowners, before drilling and developing wells on the land.  Much of EQT's present-day activity in Greene County centers upon the development of "unconventional" wells, which are first

drilled vertically and then laterally to target the Marcellus Shale. EQT's unconventional well sites can contain one or many unconventional wells.

22.    EQT's well development operations in Greene County require the investment of millions of dollars, extensive permitting from local authorities like the Township and various regulatory approvals and ongoing oversight from PADEP.

23.    Just one PADEP requirement is that EQT must plug certain abandoned wells to prevent emissions of gas or other substances from the abandoned wells into the surrounding environment. *See* 58 Pa.C.S. § 3220; *see also* 25 Pa.Code § 78.91. This plugging process requires various pieces of heavy equipment that must be hauled to the well site.

24.    Additionally, EQT's unconventional well development and production activities in Greene County require EQT to handle significant amounts of "produced water," or naturally occurring subsurface water that comes up through wells as a byproduct of gas extraction. EQT collects and stores this produced water in on-site tanks before trucking it off the well site for disposal. If EQT does not have a way to get the produced water off a given well site, then it must stop production operations on, or "shut in," the producing wells because EQT would otherwise run out of storage space for the produced water.

25.    Once EQT's wells in Greene County are producing gas, EQT also needs a way to send that gas to downstream locations so that it can be processed and sold. To do this, EQT has affiliates which operate in Greene County on the midstream side. These midstream affiliates construct and operate complex pipeline systems that gather EQT's gas from its wells and transport that gas to the requisite downstream locations for commercial sale. EQT then uses the revenue it generates from the downstream gas sales to pay royalties to certain landowners who have leased oil and gas rights to EQT.

26.     EQT's oil and gas operations in Greene County are thus highly interdependent and hinge upon the time-sensitive coordination of multiple moving pieces—any deviation from which can impact various interested parties.  Critical to these integrated operations is the transportation of heavy equipment and materials from one project site to another, which requires the use of local roads, like those of the Township.

**B.     Heavy hauling in the Commonwealth and in the Township.**

27.     Chapter 49, Section 4902 of the Commonwealth's Vehicles Code authorizes the Pennsylvania Department of Transportation ("PennDOT") and "local authorities" to impose "restrictions as to the weight or size of vehicles operat[ing] upon" roads within their respective jurisdictions.  *See* 75 Pa.C.S. § 4902(a)(1).

28.     The Township is a "local authority" under the Vehicles Code.  *See id.* at § 102 (defining "local authorities" as "[c]ounty, municipal and other local boards or bodies having authority to enact laws related to traffic.").

29.     A local authority like the Township may only impose weight limits on a given road "when [it] determine[s] by conducting an engineering and traffic study as provided for in [PennDOT] regulations that the [road]…may be damaged or destroyed unless use by vehicles is prohibited or the permissible size or weight of vehicles is reduced."  *See* 75 Pa.C.S. § 4902(a)(1) (emphasis added); *see also* 67 Pa.Code § 212.117(b) (providing that "[t]raffic on a [road] may be prohibited or restricted by weight of vehicle…when warranted by an engineering evaluation," before describing permissible parameters of said evaluation and when it would "warrant[]" imposition of weight limit restriction); PennDOT Publication 221 (June 2018), p. 6 ("The first step of establishing a posted weight restriction in a municipality is performing a Traffic and

7

Engineering Study (T&E Study)," which "must be completed and approved by a professional engineer in the state of Pennsylvania *for the restriction to be enforceable*.") (emphasis added).

30.    Once a local authority has conducted a traffic and engineering study on a road to determine whether a weight limit is necessary, the local authority "must pass an ordinance to post a roadway." *See* PennDOT Publication 221, p. 7. "The road name and road number (if applicable) should be shown in the ordinance." *See id*.

31.    From there, Section 4902 of the Vehicles Code allows a local authority to "issue permits for movement of vehicles of size and weight in excess" of the weight restrictions it has imposed by ordinance and "require such agreement or security as [it] deem[s] necessary to cover the cost of repairs and restoration necessitated by the permitted movement of vehicles." *See* 75 Pa.C.S.A. § 4902(c)(1); *see also id*. at subsection (c)(2) (authorizing PennDOT to "establish the types of permits and agreements to be entered into" for purposes of heavy hauling); 67 Pa.Code § 189.4 (providing that excess weight vehicles cannot be driven on posted roads without heavy hauling permits, describing types of permits and conditioning permit issuance on "excess maintenance agreement by the permittee to accept financial responsibility for excess maintenance of the posted highway or potion thereof to be used by the permittee…").

32.    On July 1, 2008, the Township purported to enact its Vehicle Ordinance pursuant to Section 4902 of the Vehicles Code and the PennDOT regulations promulgated thereunder. *See* Ex. A § 2.

33.    Section 4 of the Vehicle Ordinance provides that the Township's "Board of Supervisors has determined and hereby determines based upon engineering studies conducted by [PennDOT] and otherwise" that over 25 Township roads (i.e., the Regulated Roads) "may be

damaged or destroyed unless the permissible weight of motor vehicles is restricted to ten (10) ton weight limits…" *See id*. § 4.

34.     Section 6 of the Vehicle Ordinance then provides that the Township's Board "may issue permits for the movement of motor vehicles or combinations with weights in excess of the restrictions imposed under Section 4, supra., and may require such undertaking or security as they deem necessary to cover the costs of anticipated or probable repairs and restoration necessitated by the permitted movement of vehicles." *See id*. § 6.

35.     Section 6 of the Vehicle Ordinance notably does not address any Township procedure or basis for suspending and/or revoking an as-issued heavy hauling permit or related agreement. *See id*.  Nor does any other part of the Vehicle Ordinance. *See generally* Ex. A.

**C.     EQT's historic heavy hauling activity in the Township.**

36.     EQT has secured and maintained heavy hauling permits with the Township under the Vehicle Ordinance for over 15 years, as evidenced by the EQT Heavy Hauling Agreements.

37.     EQT entered into the first of these Agreements with the Township in February 2009 (i.e., shortly after the Township had enacted the Vehicle Ordinance). *See* 2/3/2009 Agreement, attached as **Exhibit B** (the "2009 Blanket Heavy Hauling Agreement").[1]

38.     The 2009 Blanket Heavy Hauling Agreement provides that EQT, its suppliers, contractors, subcontractors, agents and/or employees "***shall have the right*** to use the Township roads for the purpose of overweight haulage for business purposes within the Township," as long as EQT "pay[s] such reasonable sums of money needed to repair damage to the Township roads

---

[1] The 2009 Blanket Heavy Hauling Agreement identifies "Equitable Production Company" as the "Operator" thereunder.  *See id*. at Preamble.  "Equitable Production Company" is a prior name of Plaintiff EQT Production Company.

directly caused" by EQT's heavy hauling activities and maintains a bond in the "combined amount" of $50,000. *See id*. at Preamble, §§ 1, 3.

39.    EQT posted the $50,000 bond in favor of the Township the day after the 2009 Blanket Heavy Hauling Agreement was executed. *See id*. at 2/4/2009 Safeco Ins. Cos. Bond Attachment.

40.    In addition to having an indefinite term, the 2009 Blanket Heavy Hauling Agreement does not limit EQT's permitted heavy hauling activities to any particular Regulated Road, with EQT instead entitled to "notify the Township of the Township roads it intends to use and when it finishes using the same." *See id*. §§ 2, 7; *see also id*. at 2/4/2009 Safeco Ins. Cos. Bond Attachment (observing that EQT, as principal, "has been or is about to be granted a license or permit to…heavy haul[] for ***all roads*** in Morgan Township, Green[e] County, PA.") (emphasis added).

41.    The 2009 Blanket Heavy Hauling Agreement does not give the Township a contractual ability to suspend and/or revoke any heavy hauling permits connected to the Agreement. *See generally* Ex. B.

42.    It does provide, however, that, "[i]n the event of a material breach of this Agreement by either party, each party shall have the right to," once a three-day notice-and-cure period elapses, "pursue its remedies provided by the laws of the Commonwealth of Pennsylvania for damages arising out of the breach of the other party." *See id*. § 8.

43.    Upon information and belief, the Township subsequently treated the 2009 Blanket Heavy Hauling Agreement and its $50,000 bond as the primary heavy hauling permitting

mechanism for EQT (and its affiliates) over the next decade and a half, with the Township never purporting to terminate the Agreement during this span.[2]

44.     Indeed, upon using various Regulated Roads in the ensuing 15 years in accordance with the 2009 Blanket Heavy Hauling Agreement, EQT not only repaired the damage any Road sustained as a result of EQT's heavy hauling activity, but routinely put these Roads in ***better*** condition than they were in prior to EQT's use—notwithstanding the fact that the 2009 Blanket Heavy Hauling Agreement expressly exempts EQT from such measures.  *See id*. § 1.

45.     But as shown below, the Defendants had little trouble looking past these years of permitting compliance when an opportunity for leverage presented itself.

**D.     In or around October 2024, the Township demands that EQT enter into an additional yet unnecessary heavy hauling agreement and newly contends that EQT caused and must repair a slip on Prison Road.**

46.     By late-2024, EQT was engaged in and planning for various projects on its well sites in and outside of the Township, many of which consist of actively producing wells.

47.     These projects would require EQT's use of certain Regulated Roads under its existing heavy hauling permits and the 2009 Blanket Heavy Hauling Agreement.

48.     For one of these projects, the Township insisted that EQT apply for a heavy hauling permit and enter into another heavy hauling agreement to use portions of two Township roads, Arnold and Pump Station—even though Arnold Road is not a Regulated Road under the Vehicle Ordinance, and even though the existing 2009 Blanket Heavy Hauling Agreement made this additional permitting process for Pump Station unnecessary.  *See* Ex. A § 4; *see also* Ex. B.

---

[2] Upon further information and belief, EQT's affiliates also obtained numerous heavy hauling permits from, posted bonds in favor of and entered into separate heavy hauling agreements with the Township in connection with various projects during this span.

49.     But in a continued spirit of cooperation, EQT entered into the Township's requested agreement for the use of Arnold and Pump Station Roads on October 28, 2024.  *See* 10/28/24 Agreement, attached as **Exhibit C** (the "2024 Heavy Hauling Agreement").[3]

50.     Similar to the 2009 Blanket Heavy Hauling Agreement, the 2024 Heavy Hauling Agreement provides that EQT, its suppliers, contractors, subcontractors, agents and/or employees "***shall have the right***" to use the designated portions of Arnold and Pump Station for permitted heavy hauling activities as long as EQT complies with the maintenance and repair obligations set forth therein, which included the posting of an additional $12,750 bond, as well as a separate and independent $3,000 escrow payment.  *See id.* §§ 1, 3-4, 6-7; *see also* 10/22/24 Liberty Mutual Ins. Co. Bond, attached as **Exhibit D**.

51.     Unlike the 2009 Blanket Heavy Hauling Agreement, the 2024 Heavy Hauling Agreement addresses instances in which the Township may "rescind" or "revoke" EQT's permit for Arnold and Pump Station or "close" one of these roads, but the Township's authority in each instance is conditioned upon EQT's contractual noncompliance and/or the emergence of a public safety issue, "climatic condition[] or Act of God."  *See* Ex. C §§ 7, 11-12.

52.     In the event of a breach, the 2024 Heavy Hauling Agreement provides each party with the right, "immediately upon written notice to the other party," to "pursue its remedies provided by the laws of the Commonwealth of Pennsylvania for damages arising out of the breach by the other party."  *See id.* § 16.

53.     In or around the time EQT was entering into the 2024 Heavy Hauling Agreement, the Township raised the Prison Road slip to EQT personnel for the first time and attempted to charge EQT with responsibility for repairing it.

---

[3] The 2024 Heavy Hauling Agreement, which expressly references the Vehicle Ordinance, attaches EQT's as-issued permit for Arnold and Pump Station as an exhibit.  *See id.* at Preamble & p. 11.

54.    Upon information and belief, Prison Road has a long history of structural failures, including the slip, which the Township had been aware of for years prior to October 2024.

55.    Moreover, EQT had not conducted any activity (heavy hauling or otherwise) on the portion of Prison Road where the slip is located in over twenty years.

56.    EQT nevertheless investigated the Prison Road slip, determined that EQT's operations did not cause it and told the Township the same.

57.    But once more in the spirit of cooperation, and solely in an effort to protect EQT's wider operations in the Township, EQT representatives met with Defendant Sholtis and proposed possible arrangements for partnering with the Township on repairs to Prison Road.

58.    While EQT waited for a response from the Township, EQT continued with its otherwise permitted oil and gas operations in the Township and beyond.

**E.    The Township attempts to strongarm EQT into repairing the Prison Road slip.**

59.    On May 13, 2025, the Township's Board held a public meeting at the Township's municipal building.  *See* 5/13/25 Minutes, attached as **Exhibit E**.  Representatives from EQT were not in attendance.[4]

60.    At the meeting, Defendant Mullen motioned to "authorize the [Township's] Solicitor to send a letter to EQT and any other corporations they have that no further [heavy hauling] agreements will be issued and current bonds for roads will be on hold until repairs and maintenance have been done to the sli[p] on Prison Road[.]"  *See* Ex. E, p. 2.  Defendant Mullen's motion was "carried with all in favor."  *See id*.

61.    Two days later, the Township's Solicitor sent EQT representatives an e-mail at 8:30am stating that, effective as of 12:00pm, the Township would be "suspend[ing]" all EQT

---

[4] The Township maintains minutes from its most recent public meetings on its website, accessible here: https://jmcog.org/morgan-township-1.  The Township, however, does not post agendas in advance of its meetings.

heavy hauling permits and agreements and would "no longer" issue or approve permits or agreements for *any* EQT road-based operations in the Township going forward until EQT agreed to "assume the repair costs to remediate the lower slip on Prison Road." *See* 5/15/25 Tp. Solicitor E-Mail, attached as **Exhibit F**. The Solicitor based the Township's impending EQT-wide permit bar on EQT's purportedly "recalcitrant attitude" and alleged failure to propose a "solid solution" to the Township's Prison Road slip problem. *See id.*

62.    EQT contacted the Township's Solicitor the same day and reiterated its position that it would not assume liability for the slip, but also its willingness—despite having no obligation to do so—to assist the Township in resolving the issue, with EQT specifically recommending that the parties jointly assess the scope and costs of potential repair work and identify contractors capable of performing such work.

63.    The Township left EQT's heavy hauling permits intact as it purportedly considered this proposal.

64.    As EQT again waited for the Township's response, EQT—as required by Pennsylvania law and PADEP—commenced operations in early June to remediate and re-plug an abandoned conventional well in the Township (the "Equitable 1460 Well") that had recently been found to be experiencing gas leaks. *See* 5/22/25 Notice of Intent to Plug to PADEP, attached as **Exhibit G**.

65.    The Equitable 1460 Well is situated along the Township's Bacon Run Road, which is not a Regulated Road under the Vehicle Ordinance. *See* Ex. A § 4.

**F.    After several weeks of silence, the Township abruptly shuts down all EQT heavy hauling activity.**

66.    On June 11, 2025 (i.e., nearly a month after the Township's previous e-mail threat to EQT), various representatives from the Township stopped EQT's heavy hauling personnel in-

transport and interrupted operations at multiple EQT well sites (including the Equitable 1460 Well), asserting without explanation that EQT no longer had heavy hauling authorization in the Township because its permits, bonds and/or agreements had been "revoked." EQT immediately requested that the Township Solicitor clarify the Township's basis for this purported mass revocation.

67.     The next day, the Township's solicitor sent EQT an e-mail stating that the Board's "position as to Prison Road is that the slip was caused by EQT and/or a related company," "all soft costs and hard costs to repair the same are the responsibility of EQT," and "until there is either a commitment in writing or construction begins[,] the Township refuses to permit EQT and/or its contractors that use overweight vehicles on the Township roads." *See* 6/12/25 Tp. Solicitor E-Mail, attached as **Exhibit H**.

68.     Then, after EQT had paused all heavy hauling activities in the Township in response to the Township's direct interference and the Solicitor's e-mail, Defendant Mullen left a voicemail for an EQT representative, threatening EQT to "quit running the roads" "until we get some things taken care of," "cause if not, next step's the state troopers, bud."

69.     EQT promptly demanded that the Defendants reconsider their baseless, closed-door revocation of EQT's heavy hauling permits, bonds and/or agreements and confirm that EQT could resume its heavy hauling activities on all Regulated Roads, as is its right under the EQT Heavy Hauling Agreements. *See* 6/13/25 Letter to Solicitor, attached as **Exhibit I**.

70.     The Defendants have refused to do so, and EQT's necessary heavy hauling operations remain at a standstill.

71.    As a result of the Defendants' misconduct, EQT and other interested parties (including the Township's own citizenry) have suffered and continue to suffer various non-monetary and monetary harms, including but not limited to the following:

    a.    Loss of their bargained-for right to use the Township's roads in furtherance of their occupation(s);

    b.    Within days of this filing, EQT will be forced to shut in various Greene County well sites in the Township and beyond due to EQT's inability to truck out produced water from those sites, as is necessary for the safe operation of those sites;

    c.    These imminent shut-ins will halt EQT's gas production, cost EQT significant financial losses, stop the flow of royalties from EQT to local landowners;

    d.    These shut-ins will also present an active threat to certain EQT wells whose age may not allow them to fully recover and resume production post-shut in;

    e.    EQT has had to pause its PADEP-required plugging operations on the Equitable 1460 Well, creating an unnecessary risk in the Township and exposing EQT to contractor standby costs; and

    f.    EQT's continuing inability to use the Regulated Roads to haul heavy equipment and materials to and from its well sites in the Township and elsewhere in Greene County will generally compromise EQT's ability to operate its well sites and will inhibit EQT's ability to promptly address hazards if they were to arise.

72.    The Defendants have at all relevant times acted under the color of state law according to statements, ordinances, regulations and/or decisions officially adopted and promulgated by its governing body, the Board.

73.    The Defendants should be restrained from persisting in its unwarranted, unlawful and arbitrary conduct against EQT.

## COUNT I
### (42 U.S.C. § 1983 – Fourteenth Amendment Procedural Due Process v. all Defendants)

74.    EQT incorporates Paragraphs 1-73 by reference as if set forth in full herein.

75.     The 14th Amendment to the United States Constitution provides, in relevant part, that "nor shall any State deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. am. XI, § 1.

76.      EQT has a protected property interest in the EQT Heavy Hauling Agreements. EQT further has a protected property interest in the oil and gas leases under which it operates in the Township specifically and Greene County generally.  EQT also has protected liberty interests in the pursuit of its occupation and the right to travel within the Township.

77.     The Defendants have deprived EQT of the above-referenced property and liberty interests without due process of law by unilaterally revoking EQT's heavy hauling permits without notice and opportunity for either a pre-deprivation or post-deprivation hearing.

78.     The risk of an erroneous deprivation of the above-referenced property and liberty interests is high where, as here, the Defendants have justified doing so on the basis of an unrelated road slip along Prison Road for which EQT is not responsible.

79.     The Defendants' interests are low where EQT (or its affiliates) do not conduct any operations (heavy hauling or otherwise) on the portion of Prison Road where the unrelated road slip is located and where the Defendants would have incurred minimal costs in providing notice and a pre-deprivation or post-deprivation hearing to EQT.

80.     As a result of the Defendants' unconstitutional conduct, EQT has been and continues to be irreparably harmed in the manner and extent set forth above, rendering money damages inadequate.

81.     Additionally, and upon information and belief, the Township may prove judgment-proof if significant monetary damages were to be awarded against the Township as a result of this dispute, further rendering money damages inadequate here.

82.    EQT therefore seeks the requested relief described more fully below.

## COUNT II
## (Breach of Contract – 2009 Blanket Heavy Hauling Agreement v. Township)

83.    EQT incorporates Paragraphs 1-82 by reference as if set forth in full herein.

84.    EQT and the Township are parties to a valid and enforceable contract, the 2009 Blanket Heavy Hauling Agreement.  *See generally* Ex. B.

85.    EQT has performed, and continues to perform, all of its material obligations under the 2009 Blanket Heavy Hauling Agreement, which in turn entitles EQT, its suppliers, contractors, subcontractors, agents and/or employees to the continued use of the Township's Regulated Roads for permitted heavy hauling purposes.  *See id*. at Preamble, §§ 1-3, 7; *see also id*. at 2/4/2009 Safeco Ins. Cos. Bond Attachment.

86.    Accordingly, the Township has materially breached, and continues to breach, the 2009 Blanket Heavy Hauling Agreement by, without contractual or legal justification, purporting to revoke and/or indefinitely suspend EQT's heavy hauling permits, bonds and/or agreements for all roads throughout the Township, including the Regulated Roads.

87.    In accordance with the 2009 Blanket Heavy Hauling Agreement, EQT timely notified the Township of this material and ongoing breach in writing, which the Township failed to cure within the contractually specified three-day notice-and-cure period.  *See id*. § 8; *see also* Ex. I.

88.    As a result of the Township's material and ongoing breach of the 2009 Blanket Heavy Hauling Agreement, EQT has been and continues to be irreparably harmed in the manner and extent set forth above.

89.    For the same reasons explained earlier, EQT therefore seeks the requested relief described more fully below.

**COUNT III**
**(Breach of Contract – 2024 Heavy Hauling Agreement v. Township)**

90.    EQT incorporates Paragraphs 1-89 by reference as if set forth in full herein.

91.    EQT and the Township are partes to a valid and enforceable contract, the 2024 Heavy Hauling Agreement.  *See generally* Ex. C.

92.    EQT has performed, and continues to perform, all of its material obligations under the 2024 Heavy Hauling Agreement, which in turn entitles EQT, its suppliers, contractors, subcontractors, agents and/or employees to the continued use of the contractually specified portions of the Township's Arnold and Pump Station Roads for permitted heavy hauling purposes until October 28, 2025.  *See id*. at Preamble, §§ 1, 3-4, 6-7; *see also* Ex. D.[5]

93.    No contractually specified situation under the 2024 Heavy Hauling Agreement that would entitle the Township to rescind, suspend and/or revoke EQT's heavy hauling permit for Arnold and Pump Station Roads (or otherwise close those roads to EQT's heavy hauling activities) is presently in effect.  *See* Ex. C § 7, 11-12.

94.    Accordingly, the Township has breached, and continues to breach, the 2024 Blanket Heavy Hauling Agreement by, without contractual or legal justification, purporting to revoke and/or indefinitely suspend EQT's heavy hauling permit, bonds and/or agreements for Arnold and Pump Station Roads.

95.    EQT notified the Township of this ongoing breach in writing.  *See id*. § 16; *see also* Ex. I.

---

[5] Although Arnold Road is not a Regulated Road under the Township's Vehicle Ordinance, EQT groups Arnold Road together with Pump Station Road solely for the purposes of pleading its breach of contract claim against the Township under the 2024 Heavy Hauling Agreement.  In so doing, EQT does not concede that the Township has taken the proper steps to regulate Arnold Road for heavy hauling purposes (or any road in the Township, for that matter).

96.    As a result of the Township's ongoing breach of the 2024 Heavy Hauling Agreement, EQT has been and continues to be irreparably harmed in the manner and extent set forth above.

97.    For the same reasons explained earlier, EQT therefore seeks the requested relief described more fully below.

## REQUESTED RELIEF

**WHEREFORE**, EQT respectfully requests that this Court:

A.    Issue a preliminary injunction against the Defendants that prohibits the Defendants from suspending, revoking and/or otherwise interfering with any previously permitted EQT heavy hauling activity on the Regulated Roads (or any other road) in the Township until the merits of this case are finally determined, such that EQT remains able to continue such permitted activity during the pendency of this suit.

B.    Award damages, interest and further equitable, declaratory and/or legal relief (including attorney's fees) in EQT's favor as appropriate.

**Date**: June 18, 2025

Respectfully submitted,

**Babst, Calland, Clements & Zomnir, P.C.**

By: _____

Mark K. Dausch, Esquire
PA I.D. No. 205621
mdausch@babstcalland.com
Joseph V. Schaeffer, Esquire
PA I.D. No. 323256
jschaeffer@babstcalland.com
Devlin E. Carey, Esquire
PA I.D. No. 332768
dcarey@babstcalland.com
Lucille E. Wiesner, Esquire
PA I.D. No. 335060
lwiesner@babstcalland.com
603 Stanwix Street
Two Gateway Center, 6th Floor
Pittsburgh, PA 15222
(412) 394-5400
*Counsel for Plaintiff EQT Production Company*